

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Tom Seay
County Attorney
Potter County
Amarillo, Texas

Dear Sir:

Opinion No. O-2124
Re: Existence of lien to secure
state and county ad valorem
taxes for 1937, on land con-
veyed to the Farm Credit Ad-
ministration, a Federal in-
strumentality, by the Farmers'
National Grain Corporation.

Your letter of October 17, and supplemental letter
of November 4, 1940, submits for the opinion of this depart-
ment the following questions and supporting factual state-
ments, which we quote therefrom:

"Reference is here made to your Opinion No. 1910,
rendered for Hon. Geo. H. Sheppard, State Comptroller,
and approved on February 27, 1940, such opinion dealing
with the liability of land conveyed by the Farmers Nat-
ional Grain Corporation to the United States of America
for the assessment and collection of state and county
ad valorem taxes for the year 1937.

"We are enclosing for your examination and in-
spection copies of the following instruments: (1) Con-
tract between the Farmers National Grain Corp. and the
United States government; (2) Order approving such con-
tract by the Treasury Dept. of the United States govern-
ment; (3) Conveyance from Farmers National Warehouse
Corporation to the United States government. (Note:
For the purposes of the opinion requested herein, the
Farmers National Grain Corp. and the Farmers National
Warehouse Corp. may be considered as one and the same
organization, one being a subsidiary of the other).

COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable Tom Seay, Page 2

"Briefly, the facts in this case are as follows: On June 12, 1936, The Farmers National Grain Corp. entered into a contract to convey to the U. S. government all of its assets, such conveyance to be made prior to October 31, 1936, (See Sec. 3 of Instrument #1), and to be subject to the approval of the Sec'. of Treasury (See Sec. 19 of such instrument). It seems that certain minor changes were made in the original agreement, as evidenced by supplemental agreements, copies of which we have not been able to obtain. However, we understand that such supplemental agreements do not contain any provisions altering the original agreement as to any of the issues to be discussed herein. Despite the fact that such assets were to be transferred to the government prior to October 31, 1936, it seems that the Secretary of the Treasury did not approve this agreement until November 7, 1936, (See Instrument #2) and that no actual conveyance of the specific property in question was made until February 24, 1937, (See Instrument #3). We are acting under the assumption that the Farmers National Warehouse Corp. still retained title to this property on January 1, 1937, when the tax levy was made, that the government did not have title at such time, and that when the conveyance was made to the government in February of 1937, it took same subject to the tax lien for taxes assessed against said corporation. I might add that this property was not rendered for taxation by such corporation, but that an arbitrary assessment was made by the tax collector, and that such assessment was probably made after the government acquired title. We do not claim that the government is liable for the taxes in question, but do contend that there is a lien against such property for unpaid taxes for the year of 1937.

"The government is threatening to file suit in Federal Court to clear title to this property and denies that the State and County have a lien on same for 1937 taxes, for two reasons, to-wit:

"1. It is contended that the federal government acquired equitable title by virtue of the contract to convey (Instrument #1), which contract became effective on approval of the Treasury Department before January 1, 1937, and that even though the government

Honorable Tom Seay, Page 3

had merely an equitable title, the property was not
subject to taxation by the State and County. (Note:
The U. S. attorney has agreed to furnish authorities
to the effect that property in which the federal gov-
ernment has an equitable title is not subject to tax-
ation).

"2. It is further contended that no lien for state
and county taxes attached to this property because the
taxes in question were not due and payable until Oct-
ober 1, 1937, (if the corporation had retained title),
and that under our state law, no lien is created for
taxes until same become due, and that since the govern-
ment acquired title in February, 1937, it acquired
legal title before any tax lien was created or attached
to this property, and that no tax lien could be at-
tached to the property after the government acquired
title.

"We will, therefore, greatly appreciate it if you
will advise us as to the following matters:

"1. Does the contract marked Instrument #1
convey equitable title in this property to the
federal government? If so, does the fact that the
government has equitable title exempt such property
from liability for state and county taxes?

"2. At what date or time does the lien for state
and county taxes attach to property?

"3. In your opinion, is there any merit to the
government's contention No. 2, which is set out on
Page 2. of this letter?"

The determination of whether or not "Instrument
No. 1" considered in connection with "Instrument No. 2",
operates as a transfer, assignment or conveyance of the equit-
able title to the property involved, to the United States of
America, depends upon the rules of construction announced by
the courts of Texas, because it is a fundamental principle
that real property is exclusively subject to the laws of the
government within whose territory it is situated 14 Tex. Jur.
750.

Honorable Tom Seay, Page 4

Although legal title does not pass to a vendee or purchaser under a contract of sale, until actual delivery of a deed, without retention of a vendor's lien therein, said vendee or purchaser, especially where he goes into possession, is invested with equitable title from date of contract, or, in any event, from date he takes possession, and any increment, advantage, or enhancement to the property inures to his benefit, and detriment, depreciation, or loss thereto without fault of either party must be borne by him. 43 Tex. Jur. P. 241, 242; 66 C. J. 702-705; Peters v. Clements, 46 Tex. 114; Leeson v. City of Houston, (Com. App.) 243 S.W. 485, 225 S.W. 753; Dimmit Elevator Co. v. Carter, 70 S.W. (2d) 615; Ingram v. Central Bitulithic Co., 51 S.W. (2d) 1067; Alworth v. Ellison, 27 S.W. (2d) 639; Willis & Conner v. Turner, 25 S.W. (2d) 642; Rives v. James, 3 S.W. (2d) 932; Fullerton v. Scurry Co., 143 S.W. 971; Bledsoe v. Fitts, 105 S.W. 1142; Slaughter v. Coke Co., 79 S.W. 863; White v. Cole, 29 S.W. 1148; Taylor et al v. Herrin et al., 127 S.W. (2d) 945.

It is also settled by the decisions of the Texas courts and the opinions of this Department that, except insofar as the rule may be varied by agreement between the contracting parties or by a retention of possession by the vendor, the purchaser will ordinarily be liable for all taxes accruing after the execution of the contract where it is of such a character as to constitute him the equitable owner of the property. If the purchaser, after the contract is made, goes into possession and enjoys the use of the property, he is liable for the taxes accruing during his possession, notwithstanding the contract requires the vendor to convey by warranty deed at a future date. 66 C. J. 1047 - 1048; Taber v. State, 85 S.W. 835; Harvey v. Provident Investment Co., 156 S.W. 1127; Leonard v. Kendall, 5 S.W. (2d) 197; Attorney General's opinion O-2268.

Thus, it follows that if the attached instrument, designated as "Instrument No. 1" is of form and substance, tenor and effect, to vest equitable title in the real estate sought to be taxed, in the Farm Credit Administration on the date thereof, to-wit, June 12, 1936, or, as contended by the Administration, on November 7, 1936, the date of letter of Treasury Department approving with changes noted, said contract, which letter is designated as "Instrument No. 2", then such real estate would not be subject to State and county ad valorem taxes for the year 1937; because, the equitable as contradistinguished from the legal title, being subject to assessment for taxes, and said equitable title vesting in an avowed

instrumentality or agency of the Federal Government, prior
to January 1, 1937, there would probably arise an immunity
from State and county taxation under the Constitution of
the United States and Article 7150, Revised Civil Statutes
of Texas, 1925, expressly conferring exemption upon land
owned by the Federal government.

However, we do not find it necessary in this
opinion to determine the precise question of whether real
estate, to which the United States has equitable but not
legal title on January 1st of any tax year, is subject to
State and county ad valorem taxes for that year; because
we are convinced that "Instrument No. 1", whether considered
alone or in connection with "Instrument No. 2" does not
operate to vest equitable title to the land in question in
the United States prior to January 1, 1937, but, on the
contrary, both legal and equitable title on said date rested
in the Farmers National Grain Corporation, so as to be sub-
ject to State and county ad valorem taxes for the year 1937.

To reach this conclusion it is necessary to con-
sider "Instrument No. 1" in its entirety and from its four
corners. Hence, it is our desire that said instrument remain
as an attached exhibit to this opinion and considered as a
part hereof, because it is too lengthy to be copied herein
verbatim. However, we deem it necessary to refer to and
sometimes quote pertinent portions of said instrument.

In Section 1 thereof it is stated that the offer of
transfer by the Farmers National Grain Corporation (herein-
after referred to as the Corporation) to the Farm Credit
Administration (hereinafter referred to as Administration)
in payment of or to relieve itself of liabilities as of June
30, 1936, contemplates the transfer of assets and the release
of debts of the subsidiaries as well as the Corporation, ex-
cept such assets as are expressly reserved.

Section 2 provides that all acts under the con-
tract shall be performed on or before October 31, 1936, but
shall be made effective as of the close of business on June
30, 1936, and the books of the Corporation and the determin-
ation of profits and losses therefrom shall be as of that
date.

Section 3 stipulates, in part, as follows:

"3.  As of the close of business on June 30, 1936, but actually on or prior to October 31, 1936, the Corporation shall transfer all of its assets held June 30, 1936, or the proceeds thereof, except for assets retained as hereinafter provided, to the Administration, or as ordered by the Administration, and the Administration shall thereupon cancel or relieve the Corporation of all obligations of any nature whatsoever of the Corporation to the Administration except obligations evidenced by notes or documents bearing date on or after June 12, 1936, and except obligations for which the Corporation shall continue to be liable under the terms of this Agreement."

Section 4 provides that the Corporation shall retain and continue to be liable for the payment of certain described assets held and owned by the Corporation at the close of business on June 30, 1936, at a determined price, among which assets were drafts for collection, accounts receivable, deposits, advances on grain, inventories of grain, seed, etc., memberships in commodity exchanges, office furniture, fixtures and automobiles, insurance contracts, and open grain contracts, spot or futures.

Section 5 provides for the retention by the Corporation of certain described property, including certain real estate, at the option either of the Administration of the Corporation, expressed in writing before October 31, 1936.

Section 6 provides for the leasing by the Administration at the option of the Corporation, of certain properties owned by the Corporation for a period of one year commencing July 1, 1936, with an option of renewal for a further period of one year on terms and conditions to be agreed upon and with an option to purchase;  Included in this property are certain country elevators and some nineteen terminal and subterminal elevators located in Texas, Oklahoma, Ohio, Nebraska, Illinois, Kansas, Minnesota, Iowa, Washington and North Dakota.

Honorable Tom Seay, Page 7


         Section 7 provides that the Corporation, in addi-
tion to the liabilities accruing after June 30, 1936, shall
continue to be liable and in due course pay the balances due
at June 30, 1936, on all of its liabilities at that date,
including the indebtedness to the Administration, which shall
be reduced by the aggregate amount of certain described items,
including notes and grain drafts payable, customers' credit
balances, accounts payable, accrued grain handling charges
payable, accrued liability for taxes on assets retained, and
liability on claims and open grain contracts.  An amount was
fixed for reserves, and it was agreed that if all liabilities
for which reserves are set up are not sooner settled, then
commencing with the year 1937, the Corporation shall on
July 31 of each year, pay to the Secretary of the Treasury,
so much of the reserves, if any, as are no longer required
to meet the maximum liability of the Corporation for liabil-
ities not yet settled.

         Section 8 provides that in addition to the amount
the Corporation will owe to the United States of America on
account of facilities retained by it, the Corporation shall
on or before October 31, 1936, pay to the Secretary of the
Treasury an amount equal to the value of all assets retained
by it under paragraph 4, less the sum of all liabilities which
are herein provided to be paid by the Corporation under para-
graph 7, and all reserves provided, or $2,500,000., whichever
amount shall be greater.  Section 9 provides that "the Ad-
ministration shall on or before October 31, 1936, loan to the
Corporation, for working capital, an amount equal to the dif-
ference between the amount paid the Secretary of the Treasury
under the foregoing Section and $2,500,000., plus such addition-
al amounts, if any, as may be necessary to bring the total
working capital of the Corporation to $6,000,000., as of June
30, 1936," the amount loaned to be evidenced by a new note of
the Corporation, dated June 30, 1936, payable quarterly, the
unpaid principal balance on such new note to finally mature
on June 30, 1946; to secure said note a new Funding Agreement
is provided for, dated as of June 30, 1936, to supersede the
present funding agreement but similar thereto, and providing
that upon default in payment of interest or principal, the
Administration shall have the right without notice to accel-
erate the maturity of the entire indebtedness.

Honorable Tom Seay, Page 8

Section 10 provides that the Corporation shall on or before October 31, 1936, cause its original stockholders to contribute at least $3,000,000.00 to the capital stock or surplus account of the Corporation, the present outstanding stock and new stock to be allocated and issued on a basis provided therein.

Loans to stock holders for the purchase of such stock are provided by Section 11 from the Administration, and provision is made for the execution and payment of notes therefor maturing as late as 1946.

Section 12 provides that the Corporation shall retain one-eighth cent per bushel out of the marketing proceeds of grain up to and including June 30, 1938; one-fourth cent per bushel to and including June 30, 1940; and one-half cent per bushel to and including June 30, 1946, said retains to be additional collateral for the notes of the regionals to the Administration, with specific provisions for the application of such payments.

Section 14 provides that the Administration will loan the Corporation $3,000,000.00, evidenced by notes maturing July 31, 1937, to be paid from the $3,000,000.00 received from its regional stockholders.

Section 15 provides that the Administration shall, as promptly as possible and in due course, recommend to the Secretary of Treasury the acceptance by him of the settlement and rearrangement of the indebtedness of the Corporation, necessary so as to permit final performance of all of the acts provided to be performed in this agreement, as of the close of business on June 30, 1936, but actually on or before October 31, 1936, except as to accounting and any adjustments that may be necessary in connection therewith and any other obligations or undertakings which by their terms extend beyond that date. Section 16 provides that the liability on capital stock contributions and note thereon shall only become effective when the approval of the Secretary of the Treasury is obtained, and Section 17 provides that the failure of stockholders to contribute to the capital and surplus accounts shall, at the election of the Administration, accellerate the maturity of all existing indebtedness to the Administration.

Honorable Tom Seay, Page 9

Section 18 contains the agreement of the Corporation that "from the date hereof to and including the date that this agreement becomes executed, as contrasted with being executory" it will conduct its affairs in an efficient business-like manner and will make no commitments or disposition of assets other than in the usual course of business, without having first obtained the written consent of the Administration.

We have thus summarized the salient features of the contract, designated "Instrument No. 1", not because they are germane to any question of tax liability before us, but rather, to demonstrate that it is not an executory contract of sale of land, of the ordinary and usual form and substance, such as involved in the decisions cited above, but on the contrary is a detailed and comprehensive settlement agreement between the Farmers National Grain Corporation and the Farm Credit Administration, whereby the fiscal and financial affairs of the Corporation are regulated and rehabilitated. The instrument has for its subject matter property from the Panhandle to the Dakotas, and obligations ranging from the date thereof to 1946. It contemplates that the Corporation shall continue as a going concern, in full possession and control of the properties and assets, real, personal and mixed, all and singular. The real estate in controversy here described in the formal deed of conveyance between the parties on February 24, 1937, designated as "Instrument No. 3," is not anywhere mentioned or described in this contract. If included, it is embraced in the general terms "assets held June 30, 1936" which it is contemplated by Section 3, shall be transferred in relief of certain obligations owing to the Administration.

We have found no authorities in this State (and many are existent upon the general subject) which hold directly, or by reasonable analogy, that equitable title to real estate would pass to a vendee or purchaser under any such contract or agreement as the one described above. Without exception, the cases cited above and holding that equitable title to land would vest in a vendee under an executory contract of sale, turn upon factual situations

Honorable Tom Seay, Page 10

wherein the purchaser or vendee went into immediate posses-sion of the land, either under a deed, with retention of the vendor's lien, (which, in effect, is the same as an executory contract of sale, insofar as title is concerned), or under a definite contract to sell certain described land, wherein nothing remains to be done but for the vendee to pay the purchase money and the vendor to execute a warranty deed. In such cases, under the doctrine of equitable conversion, whereby equity regards that as done which ought to be done, the vendor held legal title in trust for the vendee, and the vendee held the purchase money in trust for the vendor. Such a contract of sale, while termed executory, is far different from the wholly executory contract or settlement agreement in the instant case, embracing the entire fiscal set-up of the Corporation, with future conditions and contingencies, and contemplating that possession of the property be not forthwith relinquished to the alleged vendee but remain with the alleged vendor.

It is such a contract as the Commission of Appeals was speaking about in the case of Sanderson v. Sanderson, 109 S.W. (2d) 744, at page 748;

". . .Defendant in error takes the position that the rules governing suits for specific perfor-mance have no application to the suit which, she submits, is for the recovery of the property in virtue of equitable title given her by the contract. The authorities relied upon are those holding that the vendee in the ordinary executory contract for the sale of real estate acquires at the time the contract is executed the equitable title to the property, subject to lien securing the purchase price. Tompkins v. Brooks (Tex. Civ. App.) 43 S.W. 70, (application for writ of error refused); Russell and Seisfeld v. Kirkbride, 62 Tex. 455. This change in the beneficial title results from the application of the doctrine of equitable con-version, equity regarding as done that which ought to be done. Pomeroy's Equity Jurisprudence (4th Ed.) vol. 1, § 105, pp. 117-119; § 368, pp. 685, 686. But the doctrine of equitable conversion is not applicable to a contract like that here under consideration. Upon the execution of this contract something other than the payment of money remained

612

to be done. The personal services yet to be
rendered by Mrs. Sanderson throughout the re-
mainder of Mrs. Kelton's life could not be re-
garded as performed at the execution of the
contract. The agreement contemplated the re-
tention by Mrs. Kelton of the full title to the
property until her death. Under such contract
the equitable title or right to the property
would not pass until Mrs. Kelton's death. . ."

Again, in the case of Currie v. Burgess, et al.,
120 S.W. (2d) 788, the Commission of Appeals, in constru-
ing a contract or agreement much stronger than the instant
one for the application of the rule of equitable conversion
stated above, held that neither the legal nor equitable
title passed thereby, in the following language:

(at page 790)

"We answer the first question in the
affirmative. The contract set out is plain-
ly only an executory agreement to convey. It
is not a contract of sale. It passed neither
the legal nor the equitable title. It does
not even recite that the vendor had agreed
to sell until one half of the agreed purchase
money was paid, at which time he was to exe-
cute and deliver a sufficient deed, 'granting
and conveying' the property to the vendee. It
is clear that no equitable title was to vest
until half the money was paid, because, in
case of default prior to that time, the payments
were to be forfeited as liquidated damages,
and the contract would be of no force and
effect. This appears to have been the prac-
tical construction which the parties themselves
placed upon the contract, for it is shown that
Jarmon finally abandoned the property and turned
it back to Burgess; no deed ever having been
delivered." (Emphasis ours)

Honorable Tom Seay, Page 12


Therefore we say that the contract or agree-
ment, designated as "Instrument No. 1," is, at most, only
an executory agreement to convey, and not a contract of
sale. Being dependent or conditional upon some contin-
gency or future act of the parties, and contemplating
that possession of and dominion and control over the
property remain with the Corporation, rather than the
Administration, it does not pass equitable title to the
Administration. Nor is this effected by "Instrument No.
2," which is a mere letter of approval, with changes
noted, of this compromise or settlement agreement by the
Secretary of the Treasury. Legal title to certain de-
scribed property vested in the Farm Credit Administration
on February 24, 1937, by virtue of execution of the form-
al deed of conveyance, without retention of vendor's lien,
by the Corporation. But prior thereto, both legal and
equitable title rested in the Corporation, so as to make
it personally liable for state and county ad valorem
taxes for the year 1937. The Farm Credit Administration
is not personally liable for such taxes. Winters v. Inde-
pendent School District of Evant, 208 S.W. 574, Childress
County v. State, 127 Texas, 343, 92 S.W. (2d) 1011.

This conclusion requires consideration of your
second and third questions regarding the effective date of
accrual of the State and county ad valorem tax lien upon
the land conveyed, for taxes for the year 1937. If said
lien became fixed upon the real estate in question as of
January 1, 1937, then the Farm Credit Administration would
take such property on February 24, 1937, subject to said
lien but without any personal liability for said taxes.
On the other hand, if this tax lien did not become a
charge upon the property until the assessment of the taxes,
or, as contended by the Government, until such taxes should
become due and payable on October 1, 1937, then no lien
would exist to secure these taxes, because legal title
vested in the United States, through its agencies, admit-
tedly prior to these dates and occurrences, with a conse-
quent immunity. In the latter instance, only a personal
liability would rest upon the Farmer's National Grain
Corporation for the 1937 taxes.

614

Article 8, Section 15, Constitution of Texas, provides for the following lien:

"The annual assessment made upon landed property shall be a special lien thereon; and all property, both real and personal, belonging to any delinquent taxpayer shall be liable to seizure and sale for the payment of all the taxes and penalties due by such delinquent; and such property may be sold for the payment of the taxes and penalties due by such delinquent, under such regulations as the Legislature may provide." (Emphasis Ours)

Article 7172, Revised Civil Statutes of Texas, 1925, is declaratory of this constitutional lien, and provides:

"All taxes upon real property shall be a lien upon such property until the same shall have been paid. And should the assessor fail to assess any real estate for any one or more years, the lien shall be good for every year that he should fail to assess for; and he may, in listing property for taxes any year thereafter, assess all the back taxes due thereon, according to the provisions of this title."

Article 7151, R.C.S. of Texas, 1925, provides in part as follows:

"All property shall be listed for taxation between January 1 and April 30 of each year, when required by the assessor, with reference to the quantity held or owned on the first day of January in the year for which the property is required to be listed or rendered."

No specific time being fixed in the Constitution or statutes for the attachment of the ad valorem tax lien on land, resort must be had to case law for the solution of this controlling fact.

The early case of Cruger v. Ginnuth, 3 Willson, Tex.
A. Civ. Cas. Section 24, under constitutional and statutory
provisions substantially similar to the ones now governing,
held as follows with reference to the time for the accrual
of this lien:

> "Unquestionably under the provisions of the
> laws cited, appellant, being the owner of the land
> on the 1st day of January, 1882, was liable person-
> ally for the taxes thereon for that year, though the
> amount of such taxes was to be subsequently ascer-
> tained, and though collection could not be made
> thereof before October; for the law expressly pro-
> vides that the taxes shall be charges against the
> person owning the property on January 1st. From
> this it follows that appellee Ginnuth was not lia-
> ble personally for the said taxes, he not having
> become the owner of the land until after January 1,
> 1882. This being true, we think the lien provided
> by the Constitution attaches at the time the lia-
> bility is fixed by the statute, and is an incumbrance
> upon the land, though the amount of the taxes is not
> then fixed and determined. . . .

> "Under our system the tax is levied on the 1st
> day of January of each year, and the assessment is
> made as of that date, although the rendering or
> listing and valuation of the property is in fact
> subsequently made. The evidence in this case shows
> that the state and county taxes were an incumbrance
> upon the land when conveyed by appellant."

This decision is followed in the case of Carswell
& Company v. Habberzettle, 87 S.W. 911, wherein the court
said:

> "All property owned by a person in this state
> on the 1st day of January must be listed for taxa-
> tion between that date and June 1st of each year;
> and, notwithstanding the taxes do not become due
> until the 1st day of October following, he is
> personally liable for the taxes of that year, though
> he sells the property before the amount of such

616

taxes has been ascertained, and before the payment
thereof becomes due.  If not paid on or before
the 31st day of January of the succeeding year,
a penalty of 10 per cent on the entire amount of
such taxes accrues.  To secure the payment of
taxes and penalties, the Constitution provides
that 'the annual assessment made upon landed
property shall be a special lien thereon, and
all property, both real and personal, belong-
ing to any delinquent taxpayer shall be liable
to seizure and sale for the payment of all the
taxes and penalties due by such delinquent.'
Article 8, | 15.   This lien attaches and the
taxes become an incumbrance on the land from
the date liability is fixed on the owner, which
is the 1st day of January of the year, although
the amount of said taxes is not fixed and de-
termined until some time subsequent thereto.  It
follows that the taxes due by appellee's intest-
ate for the year 1900 on the land sold appellants
were an incumbrance on said land when conveyed,
and remained such until paid off by them, in June,
1901.  Cruger v. Ginnath, 3 Willson, Civ. Cas.
Ct. App. | 24; Almy v. Hunt, 48 Ill. 45; Rundell
v. Lakey, 40 N.Y. 514."

In the case of State v. Farmer, 59 S.W. 541, the
Supreme Court of Texas, in construing this constitutional
lien held, at first view, contrary to the above decisions,
in stating:

"The state claims no personal liability on the
part of the defendant, Farmer, for the taxes, but
asserts that Farmer bought it subject to the tax
lien on the state, and seeks to enforce the lien
upon the land itself.  Article 7, | 15, of the
constitution reads as follows:  'The annual assess-
ment made upon landed property shall be a special
lien thereon, and all property, both real and personal,
belonging to any delinquent taxpayer shall be liable
to seizure and sale for the payment of all the taxes
and penalties due by such delinquent; and such prop-
erty may be sold for the payment of the taxes and
penalties due by such delinquent, under such regu-
lation as the legislature may provide.'  The lien of
the state, under the provisions of the Constitution,

Honorable Tom Seay, Page 16

> arises out of the assessment of the property,
> and does not exist until that assessment is
> made. It is the assessment made annually by
> the officers of the state, under and in accord-
> ance with the law, which holds a lien upon the
> land. The word 'assessment,' as here used, evi-
> dently means the sum which has been ascertained
> as the apportioned part of the tax to be charged
> against the particular piece of property; but
> under our constitution, and the provisions of
> our statute, the word embraces more than simply
> the amount, and includes the procedure on the
> part of the officials by which the property is
> listed, valued, and finally the pro rata de-
> clared. Clegg v. State, 42 Tex. 610; . . ."

However, the issue before the court in State
v. Farmer, supra, was the existence of this lien, under
an assessment, invalid because of a defective description
of property, rather than the time for the attachment of
such liens. Therefore, we do not believe the quoted lang-
uage should be extended to mean that the lien does not at-
tach until such time as all statutory duties of the assess-
or are performed and the amount of the tax finally computed.
The court was merely holding that a lawful and valid assess-
ment was a prerequisite to the existence of a lien but was
not passing upon the time for the accrual thereof. That it
was not the intention of the Supreme Court to overthrow the
decisions hereinabove discussed, holding that the lien at-
taches as of January 1st of the tax year, rather than on
the date of the actual "assessment," is indicated by the
approved judgment of the Commission of Appeals in the case
of Mission Independent School District, et al v. Armstrong,
222 S.W. 201, wherein said cases were cited with approval,
in determining the time of attachment of the lien to se-
cure taxes of an independent school district.

It is our opinion that the Farm Credit Administra-
tion did not acquire title to the land in question, either
legal or equitable until February 24, 1937, and that said
property was charged with and subject to a constitutional
lien to secure state and county ad valorem taxes for the
year 1937; and that said lien attached on January 1, 1937,

Honorable Tom Seay, Page 17

despite the fact that the assessment of such taxes was made subsequent to the acquisition of title by the Farm Credit Administration and did not become due and payable until October 1, 1937.

Trusting the foregoing fully answers your inquiries, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Pat M. Neff, Jr.
Assistant

PMN:js

APPROVED
OPINION
COMMITTEE
BY _____
CHAIRMAN

APPROVED JAN 3, 1941

ATTORNEY GENERAL OF TEXAS